IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MIDWOOD MANAGEMENT
CORPORATION,                                    *

    Plaintiff,                                  *

                             Civil Action No. 8:25-cv-02534-PX

    v.                                          *

PERRY J. SMITH, *et a*l.,                       *

    Defendants.                                 *

***

**<u>MEMORANDUM OPINION</u>**

Pending is Plaintiff Midwood Management Corporation ("Midwood")'s partial summary judgment motion against Defendant Perry Smith ("Perry"), and his wife, co-Defendant Elisabeth Smith ("Elisabeth") for actual and constructive fraudulent conveyance pursuant to the Maryland Uniform Fraudulent Conveyance Act ("MUFCA"), MD. CODE ANN., Com. Law §§ 15–204 to 15–207. ECF No. 36. The motion is fully briefed, and no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the motion is denied.

### I.    Background

On September 19, 2019, Midwood sued Perry and his former business partners in the Superior Court of the District of Columbia after Perry defaulted on his personal guaranty to pay on a commercial lease (the "Contract suit"). ECF No. 30-1. *See also Midwood Management Corp, et al. v. Matchbox, LLC, et al*., Case No. 2019-CA-6184-B (D.C. Super. Ct. 2019). Perry believed he would prevail at trial on the theory that someone had forged his signature on the guarantee agreement; but once he learned he would have his case tried before a judge instead of a jury, he knew he would be "held liable." ECF No. 36-5 at 21:3–22:4; ECF No. 40-14 ¶ 13. Trial took place on March 11, 2024. ECF No. 30-1.

Perry's predictions turned out to be true.  On June 26, 2024, the court found in favor of Midwood and held Perry and his former business partners jointly and severally liable for $1,568,365.52.  ECF No. 30-1; ECF No. 30-2.  Final judgment was entered in October 2024, and Midwood next domesticated the judgment on December 23, 2024.  ECF No. 30-3.

As the Contract suit wound its way through court for five years, Elisabeth knew about the matter, but "wasn't very involved."  ECF No. 36-6 at 19:9–21; ECF No. 40-15 ¶ 5.  However, once the Court found against Perry in June 2024, Elisabeth knew her husband was in deep debt.  ECF No. 36-6 at 26:8–19.  As did Perry.  He concedes that he had insufficient personal assets to satisfy the judgment in 2024, or for the ten years prior.  ECF No. 36-5 at 23:6–11.

Midwood attempted mightily to recover the judgment from Perry.  This suit is its latest effort, premised on Midwood's belief that Perry and Elisabeth intentionally moved Perry's individual assets to those held jointly with Elisabeth, and thus, beyond the reach of Midwood.  To best place Midwood's motion in context requires the Court to follow the money during the period before and during the Contract suit.  The Court begins with the primary accounts in which money flowed freely during this time.

### A.    Individual and Joint Fidelity Brokerage Accounts

The largest transfer activity occurred between Perry's individual Fidelity brokerage account (the "Individual Account"), ECF No. 30 ¶ 78; ECF No. 33 ¶ 78, and the one held jointly with Elisabeth (the "Joint Account"), ECF No. 30 ¶ 79; ECF No. 33 ¶ 79.  Notably, from 2018 through 2021, Perry moved no funds from the Individual Account into the Joint Account.  ECF No. 30 ¶¶ 83–84; ECF No. 33 ¶¶ 83–84.  But once Perry realized he was going to lose the Contract suit, and then indeed did lose, he moved over $800,000 from the Individual to the Joint Account. ECF No. 30 ¶ 88; ECF No. 33 ¶ 88; ECF No. 36-12.

Even more telling, the transfers grew in size and frequency as trial approached. For example, on March 2, 2021, Perry made a single transfer of $43,792 from the Individual to the Joint Account. ECF No. 30 ¶ 89; ECF No. 33 ¶ 89. But in the twelve months preceding the judgment, and even during the trial, Perry made 20 separate transfers from his Individual Account to the Joint Account, totaling in $296,500. ECF No. 30 ¶ 94; ECF No. 33 ¶ 94. And in early 2024, Perry made eleven separate transfers to the Joint Account, totaling $453,000. ECF No. 30 ¶ 96; ECF No. 33 ¶ 96. On the day of trial, March 11, 2024, Perry transferred $40,000, ECF No. 30 ¶ 99; ECF No. 33 ¶ 99, and the day in which counsel submitted findings of fact and conclusions of law, Perry transferred $100,000, which Perry admits was the largest single transfer to the Joint Account that he had made in years. ECF No. 30 ¶¶ 102–103; ECF No. 33 ¶¶ 102–103. All told, during the pendency of the Contract suit, Perry transferred roughly $809,292 from the Individual to the Joint Account. ECF No. 30 ¶ 105; ECF No. 33 ¶ 105; ECF No. 36-12 at 2, 19.

What is more, the transfers drained the Individual Account dry. By the end of 2024, Perry had only $2,787.31 in the Individual Account and had not contributed any funds since well before the Contract suit trial. ECF No. 30 ¶ 109; ECF No. 33 ¶ 109. *See* ECF No. 36-5 at 8:14–17 & 17:1–3. Notably, however, the Joint Account also was depleted during the same period. Whereas in 2019 the Joint Account held $1,104,512, it dipped by two thirds as of December 2021, ECF No. 30 ¶¶ 114–115; ECF No. 33 ¶¶ 114–115; and three months later, had only $24,190. *Id.*

The Smiths testified, and the bank records support, that they used the Joint Account to satisfy an array of debts, including routine living expenses, utilities, car payments and college tuition. ECF No. 36-5 at 6:6–17; ECF No. 36-6 at 5:15–18; ECF No. 40-3. Perry also occasionally transferred funds from the Joint Account to pay "some of his bills directly through his own account." ECF No. 36-6 at 17:16–20; ECF No. 40-15 ¶ 9. He viewed the Joint Account as a

"conduit" to move money to his individual accounts to pay off antecedent debts.  ECF No. 40-14 ¶¶ 17–18.  But never were transfers from the Joint Account made to Elisabeth's individual accounts.  ECF No. 40-14 ¶ 30.

B.    **Individual Citibank Account, Emerson Byrd & Avalon Institute**

Perry also moved money out of his Citibank individual account (the "Citibank Account") during the same time, depleting the assets from $172,831.92 in December of 2021 to $1,912.13 by October 2024.  ECF No. 30 ¶¶ 126–130; ECF No. 33 ¶¶ 126–130.  This Citibank Account, too, was used to "pay necessary living expenses, including health insurance and utilities, and antecedent debt, such as [the Smiths'] mortgage, credit cards, and car note."  ECF No. 40-14 ¶ 22.  Periodically, Perry would transfer funds from the Joint Account to the Citibank Account to pay the bills.  ECF No. 40-9 (transferring $29,000 to pay for a series of household and personal expenses); ECF No. 40-14 ¶ 23;  ECF No. 40-8; ECF No. 40-14 ¶¶ 24–25 (November 2022 to pay PEPCO and credit card);  ECF No. 40-7 at 4.

Perry also moved money from his Individual Account to two of his business accounts— Emerson Byrd, LLC ("Emerson Byrd"), for which Perry is the sole member, and Avalon Institute, LLC ("Avalon"), for which he is 50% owner.  ECF No. 30 ¶¶ 15–16, 131; ECF No. 33 ¶¶ 15–16, 131.  In the first quarter of 2022, Perry moved $60,000 from the Citibank Account to an Avalon bank account.  ECF No. 30 ¶¶ 132, 134, 136; ECF No. 33 ¶¶ 132, 134, 136. *See also* ECF No. 36-8.  And in early 2025, he transferred $19,000 from the Citibank Account to an account for Emerson Byrd.  ECF No. 30 ¶ 140; ECF No. 33 ¶ 140.

C.    **Individual Retirement Accounts and Elisabeth's Individual Account**

Between 2018 and today, Perry has not touched his Individual Retirement Account (IRA) which is presently valued at $293,130.14.  ECF No. 30 ¶ 147; ECF No. 33 ¶ 147; ECF No. 36-10 at 40.  Elisabeth's IRA notably doubled in value from $2,161,545.19 in 2018 to $4,024,619.61 in

2024.  ECF No. 30 ¶ 158; ECF No. 33 ¶ 158.  Elisabeth has made no withdrawals from it.  ECF No. 36-10.

As for Elisabeth's individual Fidelity account ("Elisabeth's Individual Account"), it too has grown appreciably, despite her not having worked outside the home since 2009.  In 2018, the account held $1,396,005.98, but by 2025, it held $2,819,696.59.  ECF No. 36-10 at 2, 32, 37.  Nothing in the current record suggests that Joint Account funds were ever transferred directly into Elisabeth's Individual Account or her retirement account.  ECF No. 40-14 ¶ 30.

Because Perry has no current income, and the Joint Account has been almost depleted, the couple currently pay expenses from Elisabeth's Individual Account.  ECF No. 36-5 at 17:16–18:5, 18:10–18.  Although the Smiths dispute that they had a "formal agreement" to first spend down Perry's Individual Account and the Joint Account before resorting to Elisabeth's Individual Account, ECF No. 36-6 at 10:7–11, they considered this an "inevitable" progression because Perry's business had been failing for quite some time.  To that end, funds from Elisabeth's Individual Account were moved to the Joint Account to cover bills and the mortgage.  ECF No. 36-6 at 5:2–18.  *See* ECF No. 40-15 ¶ 12 (estimating transfer of $230,000 between 2021 and 2024 to pay bills).  Elisabeth also "agreed" to pay Perry's other creditors, but not Midwood because "she ha[d] nothing to do with the Midwood judgment."  ECF No. 36-5 at 25:6–13, 26:18–20, 27:3–15.

In deciding how to fund the Joint Account, Elisabeth recalls having "casual" discussions with Perry, "based on how much we need [to move] to cover [their] bills."  ECF No. 36-6 at 6:19–7:3.  Elisabeth has always been primarily responsible for "hand[ling] the bills," meaning that she is "the one that sets up the electronic payment and checks the credit card statements and . . . logs in and views where [they] are on a day-to-day or month-to-month basis with the bills."  *Id*. at

11:14–18.  Accordingly, Elisabeth sometimes directed Perry to move money; and other times, Perry would "recognize that there's a payment coming up" and offer to move money from his Individual Account.  *Id*. at 13:6–9.

With Perry's individual assets virtually nonexistent, Midwood filed this suit against the Smiths and Perry's two corporate entities, Emerson Byrd and Avalon, seeking to unwind transactions and recoup funds to satisfy the Contract suit judgment.  ECF Nos. 1 & 30.  As to the Smiths, the Amended Complaint alleges they engaged in actual fraudulent conveyance in violation MUFCA § 15–207 (Count I), and constructive fraudulent conveyance in violation of MUFCA § 15–204 (Count IV) & § 15–205 (Count III).  ECF No. 30.  The Smiths answered the Amended Complaint on February 4, 2026.  ECF No. 33.  Midwood now moves for partial summary judgment against them as to Counts I & IV.  ECF No. 36.

## II.    Standard of Review

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).

Importantly, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'"  *Campbell v. Hewitt,*

*Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)).  Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is likewise warranted.  *Celotex*, 477 U.S. at 322.

With this standard in mind, the Court first turns to the propriety of summary judgment on actual fraudulent conveyance, Count I.

## III.    Analysis

### A.  Actual Fraudulent Conveyance: § 15–207 (Count I)

Maryland prohibits actual fraudulent conveyances pursuant to MD. CODE ANN., Com. Law § 15–207.  The statute reads,

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors.

To succeed on the claim, the plaintiff must establish that a debtor-creditor relationship exists between it and the defendant; that the debtor-defendant engaged in a "conveyance"; and, that the debtor-defendant made the conveyance to another with "an intent to hinder, delay or defraud present or future creditors." *Greystone Operations, LLC v. Steinberg*, No. 454, Sept.term, 2016, 2017 WL 1365365, at *5 (Md. Ct. Spec. App. Apr. 12, 2017).  To prove fraudulent intent, however, the plaintiff-creditor must demonstrate that both the debtor and his grantee acted with the requisite intent to move assets beyond the creditor's reach.  As the Maryland Court of Appeals explained long ago, "the mere proof of an intent on the part of [the debtor] to hinder, delay, or defraud his creditor will not avoid the mortgage as against the mortgagee if the latter acted in good

7

faith in taking it, even though it operates to secure to him a priority in the payment of his debt." *McCauley v. Shockey*, 66 A. 625, 627 (Md. 1907).

Fraudulent intent on the grantor's part, however, may be difficult to prove with direct evidence. Instead, such intent is often inferred "from various facts and incidents composing the transactions and its environment." *McCauley*, 66 A. at 627. At the outset, the grantor is accorded a presumption of "innocence and good faith," *id.*, because "the law does not prohibit near relatives from giving preference to each other when done bona fide without fraudulent intent and upon a fair consideration," even if the grantor "made himself[] insolvent," *Berger v. Hi-Gear Tire & Auto Supply, Inc.*, 263 A.2d 507, 510 (Md. 1970). But if the creditor adduces evidence of the grantor's fraudulent intent, the burden shifts to the grantee to demonstrate that she accepted the transfer in good faith and without participating in the fraudulent purpose of the grantor. *Id.*; *Wellcraft Marine Corp. v. Roeder*, 550 A.2d 377, 379 (Md. 1988). Maryland courts have identified nine "badges" of fraudulent intent that if shown, will negate the presumption of good faith: (1) insolvency or indebtedness of the transferor; (2) lack of consideration for the conveyance; (3) relationship between the transferor and transferee; (4) the pendency or threat of litigation; (5) secrecy or concealment; (6) departure from the usual means of business; (7) transfer of the debtor's entire estate; (8) reservation of benefit to the transferor; (9) retention by the debtor of possession of the property. *Berger*, 263 A.2d at 510.

Midwood spends much time explaining why "the badges of fraud" negate Perry's good faith as grantor in transferring the funds to his wife. ECF No. 36-1 at 17–21. The Court assumes without deciding that Midwood can sustain this burden. Nonetheless, the Smiths have adduced sufficient evidence to rebut Elisabeth's knowledge of fraudulent purpose behind the transfers. On this point, Midwood urges that no genuine material dispute exists as to Elisabeth's "constructive

knowledge" of Perry's fraudulent intent.  ECF No. 36-1 at 22.  To demonstrate the grantee's "constructive knowledge" of the fraudulent conveyance, the creditor must show that the grantee's "knowledge of facts and circumstances naturally and justly [was] calculated to excite suspicion in the mind of a person of ordinary prudence," prompting the grantee to inquire and discover the fraudulent purpose of the grantor.  *Fick v. Perpetual Title Co.*, 694 A.2d 138, 149 (Md. Ct. Spec. App. 1997) (quoting 37 C.J.S. Fraudulent Conveyances § 126, at 957–58 (1943)).

When viewing the record most favorably to the Smiths, a genuine material dispute exists as to Elisabeth's "constructive knowledge" of the alleged fraudulent conveyances.  Although Elisabeth knew that Perry generally was "insolvent," she also knew that the bills needed to be paid, and that Perry would provide at least some of the funds to satisfy an array of debts.  ECF No. 36-1 at 22.  Placed in the context of how the Smiths ran their house, this does not alone necessarily "excite suspicion in the mind of a person of ordinary prudence, and which would naturally prompt [the grantee] to pause and inquire about consummating the transaction[.]"  *Fick*, 694 A.2d at 148 (quoting 37 C.J.S. Fraudulent Conveyances § 126, at 957 (1943)).  This is especially so if the jury believes that for the critical years of 2021 to 2024, Elisabeth spent little time thinking about the Midwood matter, and most of her time taking care of her aging parents.  ECF No. 40-15 ¶ 5.  Likewise, a reasonable jury may conclude that general knowledge about Perry's insolvency does not mean she understood enough about the Contract suit to have "constructive knowledge" of the fraud on Midwood.  ECF No. 36-6 at 25:8–11 (Elisabeth explaining she believed Perry was "working on paying" other unrelated business debts off); *id.* at 25:12–20 (Elisabeth explaining she could not pinpoint when Perry became insolvent but that "over the years" she realized "without money coming in . . . eventually it would run out.").  *See, e.g.*, *In re Maryland Prop. Assocs., Inc.*, No. 00-5578-JS, 2007 WL 1074069, at *23 (Bankr. D. Md. Jan. 31, 2007), *aff'd in part, modified*

*in part sub nom. Colombo Bank, F.S.B. v. Goldstein*, No. CV WDQ-07-0514, 2007 WL 9780462 (D. Md. Aug. 3, 2007), *rev'd in part on different grounds In re Maryland Prop. Assocs., Inc.*, 309 F. App'x 737 (4th Cir. 2009) (explaining grantee-bank "knew or should have known that the payments in question were fraudulent as to the debtors because they were not made for any legitimate corporate purpose."). Because genuine issues of disputed fact exist as to Elisabeth's knowledge of the fraudulent purpose of the transfers, the Court denies summary judgment as to Count I.

### B. Constructive Fraudulent Conveyance: § 15–204 (Count IV)

Next as to Count IV, unlike actual fraudulent conveyance, the creditor need not show actual fraudulent intent on the part of the debtor to sustain its burden for constructive fraudulent conveyance. MD. CODE ANN., Com. Law § 15–204. Rather, the claim is satisfied if the debtor made the conveyance while insolvent, or became insolvent by virtue of the conveyance, and received no consideration in return. *Clucksters, LLC v. D&L Urb. Holdings, LLC*, No. 0648, Sept. term, 2021, 2026 WL 632503, at *7 (Md. App. Ct. Mar. 6, 2026) (quoting *Molovinsky v. The Fair Employment Council of Greater Washington*, 839 A.2d 755, 764 (Md. Ct. Spec. App. 2003)). *See also Greystone Operations, LLC*, 2017 WL 1365365, at *3.

The Smiths principally dispute summary judgment on the last element—that the conveyances were made without fair consideration. ECF No. 40-1 at 9. The Court agrees that a genuine dispute exists regarding this element. For one, the money trail is complicated. While Perry transferred $809,262 from his Individual Account to the Joint Account between 2021 and 2024, he also transferred $909,600 from the Joint Account to either the Individual Citibank, Emerson Byrd, or Avalon accounts during the same time, ECF No. 40-14 ¶ 20, and all to pay expenses such as health insurance, the mortgage, utilities, and other debts. ECF No. 40-14 ¶ 22. From this, a reasonable juror could conclude that because Perry used the funds to satisfy

"antecedent debts," he has received fair consideration.  *In re Abatement Env't Res., Inc.*, 102 F. App'x 272, 280 (4th Cir. 2004) ("'value' includes satisfaction of antecedent debt.") (quoting 3 Norton Bankruptcy Law & Practice 2d § 58:2 (1997 & Supp.2003)).  By contrast, no evidence suggests that Elisabeth received those funds into her Individual Account or otherwise personally gained from the transfers without giving due consideration in return.  *Cf. Cruickshank-Wallace v. Cnty. Banking & Tr. Co.*, 885 A.2d 403, 425 (Md. Ct. Spec. App. 2005) (no fair consideration where debtor transferred tax refund to wife, who spent some of that money on household necessities but also on personal expenses), *abrogated on other grounds by Wal Mart Stores, Inc. v. Holmes*, 416 Md. 346, 7 A.3d 13 (Md. 2010).  This alone generates an issue of material fact as to whether Perry transferred the funds in good faith to the Joint Account to satisfy antecedent debts, or to hide the funds under Elisabeth's coattails.  *In re Abatement Env't Res., Inc.*, 102 F. App'x at 80 (quoting *Westminster Sav. Bank v. Sauble*, 39 A.2d 862, 863 (Md. 1944)) ("The object of the statute was to aid in the suppression of fraud by protecting creditors from any conveyances by debtors to relatives or friends under the pretext of discharging a moral obligation.").  Thus, summary judgment must be denied as to Count IV.

## IV.    Conclusion

Based on the foregoing, the motion for partial summary judgment at ECF No. 36 is DENIED.

A separate order follows.


_____8/4/2026_____                    _____/s/_____
Date                                               Paula Xinis
                                                   United States District Judge